IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

AMERIFACTORS FINANCIAL GROUP LLC                           PLAINTIFF

v.                                No. 4:12-cv-202-DPM

WINDSTREAM SUPPLY LLC                                    DEFENDANT/
                                               THIRD-PARTY PLAINTIFF

v.

HAL-TEC CONSTRUCTION INC.            THIRD-PARTY DEFENDANT

## ORDER

1. We're finally at the core of this case — whether Windstream broke its contract with Hal-Tec when the parties wound down their business relationship. This Court's prior Orders give the details. № 34 & 59. Hal-Tec is in the margins: it assigned its contractual rights to Amerifactors, who is the Plaintiff here; and Hal-Tec is in default on Windstream's third-party complaint. Windstream seeks summary judgment, while Amerifactors says disputed facts require a trial. The parties agree that their contract is unambiguous. The Court concurs. And viewing the record in the light most favorable to Amerifactors, the Court sees no genuinely disputed material facts. *Hyman Freightways v. Carolina Freight Carriers Corp.*, 942 F.2d 500, 502

(8th Cir. 1991).

**2.** Windstream, it's agreed, terminated the parties' relationship in late April 2009 effective at the end of July. The parties' contract allowed for immediate termination for cause. *№ 1-1 at* ¶ 33(a). Windstream had cause because Hal-Tec wasn't installing communication lines and related equipment in a timely and efficient fashion. *№ 97-1 at 25, 29, 33–35, 40; № 97-2 at 4–9.* So the ninety days was an accommodation. In early May, Windstream sent Hal-Tec a confirming letter about the ninety-day period for wrapping up the approximately fifty projects Hal-Tec had in hand. *№ 75-2.* The letter is quoted in the margin.* The letter noted that, during the transition period, the

---

* Windstream Supply, Inc.
13560 Morris Rd.
Alpharetta, GA 30004
800-533-3161
www.windstream.com

May 7, 2009

VIA NEXT DAY AIR

Hal-Tec Construction, Inc.
Attn: Robert Hales
405 North Reo St.
Tampa, FL 33609

Re:   Termination of Master Contractor Agreement No. 081028A14

parties' master agreement continued to govern.

Around the time of the confirming letter, though, things changed again.

It turned out that, notwithstanding promise of best efforts, Hal-Tec might not

be able to complete all its projects by late July. Windstream pulled

approximately forty projects — all those where Hal-Tec had not already started

---

Dear Mr. Hales,

Windstream Supply, LLC hereby notifies you that it is terminating its Master
Contractor Agreement (MCA) with Hal-Tec Construction, Inc., dated January
1, 2009 in accordance with section 33(a). This termination will be effective on
July 31, 2009. It is our expectation that Hal-Tec will perform under the terms
of the MCA and provide for a smooth and orderly transition. The
Windstream point of contact for the transition will be Mr. Ken Allison. Ken
can be reached at 918-451-3436 or via email at Ken.Allison@windstream.com.

If you have any questions do not hesitate to contact me.

Sincerely,

Andy Chappina
Manager, Contractor Services
678-351-8436
Andy.Chappina@Windstream.com

cc:    Bobby Daenen
       Tim Mortensen
       Ken Allison
       Al Schroeder
       Reneatta Austin

-3-

work. When the parties parted ways, Hal-Tec possessed several hundred thousand dollars of contract-related supplies that it had, as the contract required, bought from Windstream.

Hal-Tec's main point is that Windstream back tracked on the ninety days. That period, the contractor says, would have allowed it to use up the supplies, or most of them. Pulling most of the current projects, and then not buying the materials back, was a one-two punch that (Amerifactors argues) violated both the parties' oral contract about how to unwind their relationship and the parties' foundational agreement.

**3.** The meaning of the parties' unambiguous "Master Contractor Agreement for Network Services" presents questions of law. *Artman v. Hoy*, 370 Ark. 131, 136–37, 257 S.W.3d 864, 869 (2007). The parties agreed that there could be no change in their agreement without a writing signed by both sides: "No modification or amendment of the terms of this Agreement other than as specifically provided herein, shall be effective except through a writing executed by both parties." № 1-1 *at* ¶38(g). No such writing exists. Windstream's confirming letter wasn't signed by Hal-Tec. Locking in a ninety-day grace period would have been a substantial change in the parties'

master agreement, which allowed immediate termination.

Windstream's primary argument—the no-oral-modification clause entitles it to judgment—fails. As counter-intuitive as it may seem on first thought, this kind of clause is unenforceable in this kind of case. Article 2 of the Uniform Commercial Code, which the clause echos, is inapplicable to this services agreement. ARK. CODE ANN. § 4-2-101. The parties' agreement is not within the statute of frauds. ARK. CODE ANN. § 4-59-101. The common law applies. And that law, in Arkansas and elsewhere, allows contracting parties such as Windstream and Hal-Tec to rescind or vary their obligations by making a new contract notwithstanding the terms of their existing one. *National American Insurance Co. v. Hogan*, 173 F.3d 1097, 1107 (8th Cir. 1999)(summarizing and applying the Arkansas cases); *see generally*, RICHARD LORD, 29 WILLISTON ON CONTRACTS § 73:22 (4th ed.); SARAH JENKINS, 13 CORBIN ON CONTRACTS § 71.2(2) (2003).

> Those who make a contract may unmake it. The clause which forbids a change may be changed like any other. The prohibition of oral waiver may be waived. Every such agreement is ended by the new one which contradicts it. What is excluded by one act is restored by another. You may put it out by the door; it is back through the window. Whenever two men contract, no limitation self imposed can destroy their power to contract again.

-5-

*Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 387–88, 122 N.E. 378, 381 (1919)(Cardozo, J., on the rule at common law, with quotations and citations omitted).

This is not the end of the analysis, though.  Windstream's decision in late April not to terminate the parties' relationship entirely at that point was a waiver: a voluntary and intentional relinquishment of a known right.  *Ellis v. Block*, 212 Ark. 264, 267–68, 205 S.W.2d 708, 710 (1947); *Lester v. Mount Vernon-Enola School District*, 323 Ark. 728, 732, 917 S.W.2d 540, 542 (1996). This waiver was undoubtedly effective in law.  Windstream confirmed it in writing—remember the May letter, which the parties' master agreement required.  № 1-1 at ¶ 38(c).  What did Windstream waive?  It's right in late April to terminate immediately and completely then.

Taking the record in the light most favorable to Amerifactors, Windstream did not waive its right to terminate for non-performance during the ninety-day period.  Hal-Tec and Windstream's transition arrangement remained subject to the parties' master agreement.  Windstream's letter said so.  Hal-Tec's president confirmed this on deposition:

> I'm reading this [letter] and it's effective July 31st. 'It is our expectation that Hal-Tec will perform under the terms of the MCA and provide a

> smooth and orderly transition.'  Based on my knowledge of what my
> conversation was with Mr. Brennan is that Hal-Tec will perform under
> that, finish up what you got and thank you very much.

№ 97-1 at 26–27.  Under the master agreement, Windstream retained the right

to pull the plug on some, or all, of the projects if and when Hal-Tec failed to

perform.  № 1-1 at ¶ 33.  The parties' agreed, moreover, that Windstream's

forbearance  on any contractual point would not waive the company's right

to later assert the parties' agreement.  "Waiver by Windstream of any default

by [Hal-Tec] shall not be deemed a waiver of any other default."  № 1-1 at ¶

38(c).

The result is the same if the parties' transition arrangement is evaluated

in terms of consideration.  Windstream got none.  Hal-Tec neither gave nor

promised any performance that it wasn't already bound to give.  This is not

a case where both sides got some new or different benefit.  *E.g., J.C. Engleman,*

*Inc. v. Briscoe,* 172 Ark. 1088, 291 S.W. 795, 797 (broker's commission

decreases, but he's now authorized to employ subagents).  It's not a case

where performance under the parties' original contract was disputed.  *E.g.,*

*Cox v. McLaughlin,* 315 Ark. 338, 344–45, 867 S.W.2d 460, 462–63 (1993).  This

is, instead, the paradigm case of no consideration: Hal-Tec promised to do

-7-

during the transition period only what it was already obligated to do, perform under the parties' master agreement. Windstream's promise to let Hal-Tec do so is not enforceable because it was unsupported by any consideration. *Ibid*; 3 WILLISTON ON CONTRACTS § 7:36.

The parties are experienced businesses. They tried to make the best of their parting with a transition period. Performance problems arose almost immediately. *№ 97-1 at 8–9, 39–40; № 97-2 at 7–9*. Windstream disputes the ninety-day promise. Accepting for present purposes that it was made, as Hal-Tec's president testified and as Windstream's letter shows, this promise was not in a vacuum: the parties' master agreement was the air around the delayed termination. When Hal-Tec could not ensure completion of all its projects during the ninety days, Windstream moved on. *№ 97-1 at 39*. It retained the contractual right to do so. Just as Hal-Tec came in early and finished some of its predecessor's incomplete projects before the formal Hal-Tec/Windstream master contract was made, *№ 97-1 at 7*, other contractors stepped in to do Hal-Tecs jobs when timely completion was in some doubt. Windstream is entitled to judgment on Hal-Tec's claim about the ninety-days.

**4.** Hal-Tec has no solid claim about unused wire and other supplies either. Reading all the material provisions of the parties' contract, № 1-1 at ¶¶ 1, 10, 11, 33, 34, Windstream had the right, not the duty, to repurchase these materials. "May" can be a murky word. *First United Bank v. Phase II*, 347 Ark. 879, 901, 69 S.W.3d 33, 48 (2002). But here the parties used it to mean that Windstream could buy back the materials if it chose to do so. These are the parties' words.

- Upon termination of this Agreement, Windstream may request Contractor to pick up, transport and return to a place of storage designated by Windstream any unused materials Contractor purchased from Windstream at Windstream's Affiliate cost. Contractor may invoice Windstream for such materials as if utilized under this Agreement. In the event Contractor does not return such materials in accordance with this Section 11, Contractor may not invoice Windstream for reimbursement. ¶11(d).

- Windstream may interrupt, discontinue or halt work on a Project being performed under this Agreement and, without prejudice to any other right or remedy it may have, terminate this Agreement and any or all PSA(s), immediately upon verbal notice followed by a written notice to Contractor within seven (7) business days, if . . . Contractor fails to diligently perform Services . . . If Windstream terminates the Agreement under Section 33(a), Windstream may take over the materials, tools and appliances purchased from Windstream at Windstream's Affiliate cost for use in Services, and Windstream may complete Services under the Agreement. ¶33(a).

- Upon any termination or suspension of this Agreement as herein provided, Contractor shall ... transfer and deliver to Windstream, in the manner and at the time directed by Windstream, all of its right, title, and interest in and to completed and uncompleted work, supplies, materials and all contracts, subcontracts, guaranties, books, papers, records, plans, specifications, drawings, surveys, schedules, reports and all other property produced as a part of or acquired in connection with the performance of Contractor's obligations under this Agreement and the PSAs[.]   ¶34(b).

The "shall" in paragraph 34(b) casts a shadow. As Hal-Tec argues, the word usually means a mandate. *Marcum v. Wengert*, 344 Ark. 153, 165, 40 S.W.3d 230, 238 (2001). This is not always so; shall can be murky too. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995). In any event, this paragraph must be read with paragraphs 11 and 33(a) and, if possible, harmonized. *Asbury Automotive Used Car Ctr., L.L.C. v. Brosh*, 364 Ark. 386, 392, 220 S.W.3d 637, 642 (2005).

Paragraph 34(b) covers more than the pre-ordered materials and supplies; it includes uncompleted work contracts, records, plans, surveys — everything Windstream would need to take over a project midway through. It's thus the mandate for handling a mid-project termination. But this clause also says Windstream dictates any handoff "in the manner and at the time" it decides. № 1-1 at ¶ 34(b). The discretion here conferred about

-10-

materials and supplies echos the "may" in the specific provisions about those items. *№ 1-1 at* ¶¶ 11(d), 33(a). Under the parties' agreement as a whole, Hal-Tec is stuck with the pre-ordered materials because Windstream didn't elect to repurchase them. Amerifactor's claims about these materials, made in Hal-Tec's stead, fail as a matter of law.

\*   \*   \*

Windstream's renewed motion for summary judgment as supplemented, *№ 75 & 97*, granted. Windstream's motion to exclude evidence, *№ 82*, denied as moot.

So Ordered.

D.P. Marshall Jr.
United States District Judge

20 August 2014

-11-